Judge Green.
The appellee living in 1823. Tennessee, and having an equitable title to a lot in Lynch-burg, the legal title of which was in Lynch, and a tract of land in the neighbourhood, wrote to his brother, Charles Terrell, authorising him to sell the tract of land ; and it is alledged, that in the same letter, ho also authorised him to sell the lot. The best, and indeed the only account, entitled to any weight, which we have of the nature and extent of this authority, is from the testimony of a witness who saw the letter, (which is lost,) and who states, that there was in it, this expression : “ it would be as well,” or, “perhaps it would be as well, to sell the lot in Lynch-burg, and lay out the proceeds in young negroes. ” The witness states, that the letter gave to Charles a perfect discreíionshoxxt thesame. Thisperfectdiscretionwas inferred by the witness from the terms of the letter, as before stated, and was not otherwise expressed, as is stated explicitly by the witness himself. Charles Terrell was then indebted to the appellee in upwards of $800, and still continues to be indebted ; but had voluntarily and without the request of the appellee, given his bond for a debt of the appellee, amounting to £ 125 12?., upon which bond the creditor had sued and obtained judgment. Charles Terrell sold the lot to the appellant for $500, professedly and with the knowledge of the purchaser, for the purpose of discharging this last mentioned debt; and Morris paid the ¿6125 12?. directly to the creditor. The appellant seems never to have seen the letter, and to have acted under the impression that Charles Terrell had an unlimited authority to sell and dispose of the proceeds of sale ; which impression was derived from the declarations of C. Terrell himself, and of the witness, who had seen the letter. Morris obtained from Lynch the legal title.
This sale and appropriation of the proceeds thereof, was a breach of trust on the part of Charles Terrell, and a fraud upon the appellee. The former could not, in justice, use his voluntary engagement to pay the debt of ¿6125 12.?., *12 Otherwise than by off-setting it against his larger debt to the latter, or frustrate, under pretence that the debt ought to be Paid by Micajah Terrell, the appropriation of the proceeds ;°f the sale of the lot, which the owner might have thought, and which probably would have been, very beneficial to him.: The sale, as well as the appropriation of the proceeds of sale, was fraudulent and a breach of trust. The circumstances under which it was made, %vere calculated to prejudice the sale in respect to price. It was made by a person urged by a pressing necessity to sell, in order to relieve -himself from an execution, and to a person who was apprised of this necessity. A vendor, under such circumstances, cannot expect as much for any property, as if it were known that he was under no necessity, nor even anxious to sell. It appears, by Micajah Terrell’s letter, that he was entirely indifferent whether he sold or not, and Charles Terrell’s necessities alone urged him to sell. The witnesses are of opinion, that the property was sold at a fair price. But, that is of no consequence. The principal had a right to the benefit of the sound discretion and unbiassed judgment of his agent, in respect to the most proper time for selling the property. And, it appears, that shortly after this sale, an inferior lot, near to that in question, was sold for $ 600; and probably it was notorious, that property of that description was rising in value. The appellee has lost the benefit of this judgment and discretion, (if this sale bound him,) by,the unjustifiable purpose of his agent, to appropriate the property to his own use, to serve an immediate and urgent occasion. The statement of one of the witnesses, that according to the declarations of the appellee, after the sale, Charles Terrell had a discretion to sell, means no more than that he had a discretion to sell or not, and not that he had a discretion as to the terms of the sale and appropriation of the proceeds. .
Is the purchaser, under the circumstances of this case, to be affected by the fraud and breach of trust on the part of the agent? I think he is. He who deals with an agent *13 is bound to look to bis authority. The failure of Morris to call for a sight of Ihe letter which gave C. Terrell authority to sell, was a gross negligence, and no prudent man would, in such a case, be content with the assurances of an agent or a stranger, as to the extent of the authority, when it was so easy to have ascertained the real terms of the authority, by inspecting the letter. Such negligence is equivalent to actual notice. A man who purchases an estate subject to an equity, which the title papers disclose, is bound in the same way as if he had actual notice, although he may never have seen the title papers, and may have been assured by the vendor, and believed, that the estate was free from incumbrance. It is his folly or wilful neglect, not to have resorted to the means palpably in his power, of ascertaining the true state of the title to the property for which he had treated. If Morris had seen the letter, (and he stands in the same situation as if he had,) he would have known that C. L. Terrell was selling the property for the purpose of applying the proceeds, contrary to the instructions of his principal, and would not only have been privy, hut would have been contributing, to the fraud and breach of trust on the part of the agent. I think, therefore, that the appellant cannot be protected in his purchase.
As to the claim of the appellant to be compensated for improvements, now for the first time, and in this Court, as far as it appears, asserted, I should have thought that if the appellee had asserted a claim, for rents and profits, and an account thereof had been ordered, then any permanent improvements made by the appellant, although not claimed in his answer, ought to have been allowed as a set-oif against the rents and profits, and to no other purpose ; provided, such improvements had been made before notice of the disaffirmance of the contract by the appellee. The existence of the improvements is iiot alluded to in the pleadings, nor is the time at which they were made, stated in the evidence; and if they were, I should not have thought the appellant enfitled to claim compensalionfor them, under the circumstan *14 ces of this case, except to the extent aforesaid. In many cases, a party in possession may claim a compensation for improvements against the owner, as if the latter is guilty of a frau¿ jn permitting such improvements, with a knowledge 0f pjs claim, and without giving notice thereof to the possessor, oris guilty of gross laches in asserting his claim, after he is apprized of it. In this case the appellant was not faultless. The appellee disaffirmed the contract, as soon as he was informed of it, and promptly prosecuted his suit for the recovery of the property. The sale was in September, 1809, and the answer of Morris was sworn to in July, 1810. The time of instituting the suit does not appear, but it must have been shortly after the sale.
The appellant having lost the benefit of his purchase, is entitled to have the money paid by him, refunded. In point of law his claim is against Charles L. Terrell only, who virtually received the money from him, upon a consideration which has failed. If C. L. Terrell had applied the money to the use of Micajah Terrell, although not according to his directions, the former would .have had a claim against the latter to that extent, and a Court of Equity, if nothing further appeared, might substitute Morris to the rights of C. L. Terrell. But, as the latter admits that he was indebted to Micajah, and as it appears by the evidence that he was so indebted in a much larger sum than he undertook to pay for him, he has no claim against Micajah Terrell on that account, further than to set-off the payment against his debt. This right of the appellant against C. L. Terrell being ascertained and established by the pleadings and proofs between the plaintiffs and all the defendants, a decree ought to have been rendered in favor of the appellant, against the representatives of Charles L. Terrell, for the amount paid by him to said Terrell on account of the purchase. The case of Chamley v. Lord Dunsanny and others, 2 Sch. and Lef. 690, cited at the bar, fully supports the proposition, that in such a case a decree may be made between co-defendants. And this does not conflict with the *15 decision in tlie case of Taliaferro v. Minor, in this Court,. The Court did not in that ease declare, that no decree could be pronounced in any case between co-defendants ; but that it was improper in that case.
With this variation, I think the decree should be affirmed, and the appellant should pay to the appellee his costs.
Judge Coalter.
I am by no means satisfied, that under the circumstances of this case, this sale ought to be set aside, either for the want of power in Charles Terrell to make it, or by reason of any fraudulent or improper conduct between the appellant and him, in relation to the purchase money, which ought to vacate it.
The bill denies that any power at all was given, but insists that if any was given, it was a limited power, inasmuch as it directed a sale for cash. There is no allegation, as a ground for vacating the sale, that there was inadequacy of price, or any particular destination or appropriation of the purchase money, which the agent and purchaser combined to defeat; but, that instead of a sale for cash, as directed, it was made to pay a debt due from Charles Terrell the agent, to the appellant, when he, Charles, was in his debt.
If. is proved by Christopher Lynch, who saw the letter, that it did contain a power to sell for cash, and lay the money out in young negroes, and he thinks also, a perfect discretion on the subject: that when the appellee returned to this State, he admitted he had written such a letter, and did not materially differ from the witness, as to its import and construction ; but by his construction, it would still have given Charles a discretion to sell.
The deponent was apprised by Charles of the appropriaation he intended to make of the greater part of the purchase money, as hereafter mentioned, and says that from his knowledge of the brothers, together with the letter, he would have had no hesitation in making the purchase. He also proves that the lot was sold for a fair price ; but says, the appellee complained, that Charles was in his debt.- and had not treated him well by selling the lot
*16 The denial of any authority, then, was contrary to the appellee’s own knowledge of the fact; and, in candor and-truth, he ought to have rested his case solely on the charge, that it was not a sale for cash. But this charge is denied, and as to the greater part of the purchase money, is disproved ; and on an account being ordered, I presume, could have been altogether disproved. How was it ?
The appellee, before he went to Tennessee, sold a bill on Philadelphia, and received the cash. The drawee could not be found, nor could it be discovered that any such person had ever resided there; it of course came back protested. 1 Upon this, Charles Terrell, to save the honor and credit of his brother, took in the bill, and gave his own bond, on' which, at the time of the sale, a judgment had been obtained, and execution sued out. Now, though it since appears that Charles Terrell was at that time in debt to his brother, even after a credit for this sum; yet, he says, that accounts for many years, had existed between them, the state of which he knew not, and did not know he was in debt. He was not bound, therefore, to take this step for his brother ; but having done so, and being now pressed by execution, instead of buying slaves for his brother, and suffering his own property to be sold, he made a sale of the lot for $500, and applied $418 67, to the discharge of this debt; and this, it is true, with the knowledge of the appellant at the time of the sale, of this destination of so much of the proceeds, who actually paid that debt. Suppose it had turned out that Charles had not been in debt to his brother; would not this have been a payment in cash, even to the appellee himself?
But in either way, it was, in reality, his debt. It is true, if Charles had known the state of the accounts, and had told the appellant that notwithstanding that, he intended to screen his own property, there would have been some appearance of combination between them, even if the appellant had paid over the money to him, and had alledged that it was not incumbent oh him, to see to the appi’opri *17 aiion of it. But no such case is made out; and when we add to this, that the appellant never saw the letter, but took it for granted, from the representations of Christopher Lynch and Charles Terrell, that the latter had a power to sell for cash, no intentional fraud can be attributed to him, any more than if he had paid the cash to Charles, instead of the creditor, leaving it to him to use the money as he thought proper. Some interest or unworthy motive, of which I cannot see a semblance, ought to be shewn, to inculpate him, if that is necessary; as, under all the circumstances of this ease, I think it is, in order to defeat the legal title in him, which has been thus honestly acquired and paid for. The after-disputes and settlement between the brothers, however the accounts may now stand, is not enough. Indeed, Charles cannot, he accused of intentional wrong. I come to this conclusion, not only from the bona fides, in reality, of the transaction, but because I think the appellee is not altogether clear of* blame. lie was guilty of negligence in giving a power to his brother, in whom it was natural to suppose, from their previous confidence in each other, the world would confide, if he was unworthy of that confidence ; and has thus contributed to any deception, if any has been practised by that brothel’, either on himself or others. This power, to say the least of it, was contained in a letter calculated to produce, and did produce, a belief that it justified this very sale, in the mind of the witness, and which, of course, was calculated to produce the same opinion in the mind of the appellant. Micajah Terrell had left the State without a previous settlement with his brother, leaving his own honor in jeopardy as to the bill sold, and also his brother’s in some respect, who had told the purchaser that he might rely on its payment. I cannot help thinking, therefore, that if this letter had not been lost or mislaid, or if Lynchburg lots had been falling, instead of rising, in price, on his return, we never should have heard of the defect of this power.
*18 But this was not a sale, as is alledgcd in the bill, to pay a ¿e})t ¿ue fr'om Charles to the appellant Morris. It was a sale for cash, and $418 67, was paid in cash, as above stated. As to the residue, there was a part of the original purchase money due to Lynch ; concerning which, there is, and can be no dispute ; and the small balance remaining,' was to go as a credit on a bond for a larger amount, in which the appellee went off indebted to the appellant. Perhaps Charles was security in that, or was desirous to save his brother’s honor there also ; for, he promised to pay the balance, as soon as he got his crop to market, as is alledged in the answer, and all this would, doubtless, have been proved on taking the accounts. It was, therefore, a sale for cash, and cash payments, and consequently, the only complaint in the bill is done away. This case presents another hardship, which induces me to think that less injustice will be done in affirming the sale, than in setting it aside.
About the time of the suit, whether before or after does ' not appear, the appellant sold a part of this lot, and a brick house has been built and other monies laid out, which have enhanced its value. The appellant, or some one else, perhaps equally innocent, must lose this, unless the appellee, can be made to account for it. This I think would be too great a premium on his transactions in this case. I have not particularly investigated this point, nor is it necessary, the other Judges being of •opinion, that no account of these improvements can be taken. Indeed, I am inclined to think, from the manner in which this point is presented by the record, that no account can be taken.
I therefore think we ought to reverse the decree and dismiss the bill. The other Judges, however, are of a different opinion, and the only question remaining is, whether there can be a decree between the appellant and the representatives of Charles Terrell, for the money paid in discharge of the debt aforesaid, there being no dispute as to any other sum ? The amount thus paid, as stated in the *19 answer of the appellant, was J3128 I2,v. The witness McCleland says, as near as he recollects, it was M125 12s. . It seems to me that a decree may be made between those parties. But, as those representatives have no counsel here, and as there is no one authorised to assent to a decree for any specific sum, all that we can do is, to send the cause bade for an account between those parlies, settling the principle llial it is competent for the Court to decree between them.
The appellee has recovered liis costs in the Court below against the appellant, by the decree, and must have his costs here on the- affirmance.
As to the future costs in taking the accounts, &e., they will of course be charged, either to the appellant or to the representatives of Charles Terrell, as either shall require the services producing such costs. But, on the final decree between them, I think the estate of Charles Terrell ought to be made responsible, not only for the interest of the money paid, but all costs incurred by the appellant, as well here as in the Court, below, in the same manner as if he ha.d brought a suit to have his purchase money and costs reimbursed.
As to the bond of the appellee, if that was delivered up so Charles Terrell, it ought to be returned or accounted for.